**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**CIVIL ACTION NO. _____**

| | |
|---|---|
| **CAROL V. CLENDENING AS** ) | |
| **PERSONAL REPRESENTATIVE OF** ) | |
| **THE ESTATE OF GARY J.** ) | |
| **CLENDENING** ) | |
| ) | **COMPLAINT AND DEMAND** |
| **PLAINTIFF,** ) | **FOR TRIAL BY JURY** |
| ) | |
| v. ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **DEFENDANT.** | |

Plaintiff Carol V. Clendening (hereafter, "Plaintiff Clendening"), who has filed this lawsuit by her attorneys, Carolina Law Group, P.L.L.C. against Defendant United States of America, (hereafter "Defendant") will show this Court that:

## PARTIES

1. Plaintiff Clendening is a resident of Marion County in the State of Indiana and is the widow of the decedent, Gary J. Clendening.

2. From May 1970 through December 1971, the decedent resided in the Hadnot Point area of Camp Lejeune, North Carolina as a United States Marine JAG Officer. During this period, the decedent regularly consumed and was exposed to substantial amounts of water supplied by the Camp Lejeune water supply facilities and more particularly Hadnot Point. Further, the decedent was directly exposed to radioactive waste, chemical weapon waste, solvents, benzene, and other carcinogens that were improperly disposed, buried or spilled at Camp Lejeune and particularly at the former Hadnot Point incinerator.

3. The decedent died on November 16, 2016 after battling for years Waldenstrom macroglobulinemia, chronic lymphoblastic lymphoma, and adult leukemia as a result of his exposure at Camp Lejeune.

4. The Defendant, United States of America, through its military branches the United States Navy and the United States Marine Corp, has owned and operated Camp Lejeune as a Marine Corp base since 1941. The Defendant's employees at all times were acting within the scope of their office or employment with respect to the negligent or wrongful actions and omissions alleged.

## JURISDICTION AND WAIVER OF SOVEREIGN IMMUNITY

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(l) because Plaintiff Clendening seeks to recover monetary damages for wrongful death caused by the acts and omissions of employees of the government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. A private person under the law of North Carolina would be liable for negligently or wrongfully supplying the decedent with drinking water that was hazardous to human health or directly exposing and proximately causing one's death under the circumstances alleged in this Complaint.

6. Plaintiff Clendening timely filed a claim in November 2018 pursuant to the requirements of the Federal Tort Claims Act (a copy of said claim has been attached hereto, marked as Exhibit A, and is incorporated by reference herein), and more than six months has elapsed since filing of said claim, thereby establishing jurisdiction in this Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675.

7. That the acts and omissions complained of herein by the Defendant occurred within the

1

State of North Carolina, thus rendering jurisdiction and venue proper within this Court pursuant to 28 U.S.C. § 1402(b).

8.  This action is brought pursuant to the following statutes as referenced herein: 28 U.S.C. § 2675 (Federal Tort Claims Act); 28 U.S.C. § 1346(b)(l) (Jurisdiction); 28 U.S.C. § 1402(b) (Jurisdiction); 28 U.S.C. § 2674(a) (Waiver of Sovereign Immunity). and N.C. Gen. Stat. § 1-50(a)(5)(a) (Improvement to Real Property).

## FACTS COMMON TO ALL CLAIMS

9.  The Defendant's actions or omissions to address the hazardous, chemical, and radioactive waste or to alert and treat potential exposed individuals has occurred or failed to occur within ten (10) years of the filing of this Complaint.

10.  There remain hundreds of thousands of Marines, veterans, their family members, and members of the general public that will continue to suffer or die prematurely because the Defendant has refused to act to address the environmental catastrophe at Camp Lejeune. Hundreds of thousands of Americans could benefit from protein-based granulocyte colony stimulating factor and other treatments to strengthen their compromised bone marrow and potentially stave off the horrendous suffering like the decedent here endured.

11.  Several actions have been filed under the FTCA to pursue damages based on the toxic exposure and resulting cancers, but they have been dismissed based on North Carolina's Statute of Repose. This is the first action to allege the radioactive waste and chemical weapons waste caused the injury or death and that the Defendant has within the last six (6) and ten (10) years failed to act or develop a remediation plan, to warn exposed individuals, or to treat their exposure.

12.  The Defendant through a campaign of concealment, limited disclosures and incomplete remediation have attempted to characterize the environmental catastrophe at Camp Lejeune as the

2

product of a single off-base dry cleaner (solvents) and its own spillage of fuel (benzene) – issues that are ubiquitous throughout the United States and are the cause of many environmental disasters. The Defendant, however, has neglected or intentionally withheld the larger issue of its wrongful disposal of radioactive and chemical hazardous materials that present carcinogenic levels significantly greater than those from benzene and solvents. The Defendant continues as of the date of the filing of this complaint to deny former and current residents, service members, their families, and civilians information, remediation, and treatment for their toxic exposure.

## DEFECTIVE IMPROVEMENTS TO REAL PROPERTY

13. The "Hadnot Point Fuel Farm," the former incinerator and landfill, the water supply facilities at Camp Lejeune, including the wells, underground piping and delivery systems, and water treatment plants, are improvements to real property under North Carolina law.

14. The Hadnot Point Fuel Farm was built and installed in 1941 and was comprised of 15 fuel tanks. There was one 600,000 gallon above ground tank, six underground 12,000 gallon tanks, and eight underground 15,000 gallon tanks. The underground tanks were placed at grade and completely covered with soil. The above-ground tank stored diesel fuel while the other tanks stored gasoline, unleaded gasoline, and kerosene.

15. In addition to the above described Fuel Farm, the Defendant constructed its own water supply facilities at Camp Lejeune, to include wells, underground piping and delivery systems, and water treatment plants. The Defendant constructed the wells, piping and delivery system at or around former hazardous waste, radioactive waste or chemical weapons waste locations around Camp Lejeune. The Defendant dug numerous wells to supply drinking water, built water treatment facilities, and constructed numerous pipes to carry water from the wells to the water treatment plants and thereafter to residents, businesses, and military operations throughout the

3

base.

16. The water supply facilities utilized deep water wells that tapped into the underground aquifer that had been contaminated by the leaking of toxic and hazardous materials from various sources, including the Hadnot Point Fuel Farm. It was determined that the facilities had been delivering toxic and hazardous water since the time the Fuel Farm began leaking fuel products, the hazardous material was disposed or was incinerated into the ground which contaminated the underground aquifers.

17. Over-pumping of the base's water wells sucked fuel and hazardous material that had leaked from the Fuel Farm or that had been improperly disposed at the landfill and the incinerator site and other contaminants into the deep aquifer. The contaminated ground water in turn leached toxic chemicals into the walls of the water supply wells serving the Hadnot Point water distribution system. The drinking water flowed from the wells into the Hadnot Point water treatment plant. The Defendant's employees failed to treat the contaminated water to remove the impurities and instead allowed it to flow directly to residences and businesses of military personal and civilians living and working in the area. The Defendant's employees also failed to remediate non-toxic and radioactive material that was wrongfully disposed at or near the Hadnot Point water distribution system.

18. In 1980, a Defendant contractor discovered the Defendant has disposed of radioactive Strontium 90 (Sr-90)[1] pellets and dead beagles that were a part of a nationwide case study on the long-term effects of radioactive exposure just below the surface of the ground near what is now a recreational area in and around where the decedent lived and worked while

---

[1] Strontrium-90 (Sr-90) is described as a "bone-seeker" and is far more cancerous than benzene found in gasoline. Benzene, however, presents the same biomarkers as Sr-90. Pouring or discharging fuel onto radioactive contamination or a hazardous waste site is an effective way to mask Sr-90.

4

stationed on base. In response to this unearthing, the Defendant, on April 9, 1981 conducted M67001.AR.007167 seven-page case study to evaluate the toxicity of the radioactive exposure to the inhabitants and guests of Camp Lejeune. The analysis and report all occurred prior to any notice or shutdown of the contaminated water systems. The report discovered elevated Sr-90 but in passing attributed the reading to Potassium-40 and did nothing further to ensure that former, current and future personnel and civilians were not exposed to radioactive material or, if exposed, were provided treatment, including the decedent.

19.    The wrongful disposal of radioactive and chemical waste was contrary to Federal law that preexisted the decedent's residency including the Atomic Energy Act of 1954, 42 U.S.C. §2011-2021. The Defendant has taken no further action to address the unequivocal direct radioactive exposure to the personnel and civilians at Camp Lejeune. The Defendant understands that it continues to withhold crucial information, testing, remediation, and treatment for its wrongful disposal of radioactive, chemical, and other hazardous waste at and near Hadnot Point.

20.    The Hadnot Point Fuel Farm, the water supply facilities, the incinerator, and the landfill at Camp Lejeune are defective "improvements to real property" within the meaning of N.C. Gen. Stat.§ 1-S0(a)(S)(a) because:

(a) the Defendant is both the owner and operator of the land where these improvements are located, and the Defendant's employees are the persons who constructed, installed, repaired and maintained the improvements;

(b) the improvements are permanent structures installed on the land and are attached to the realty as to make removal extremely difficult;

5

(c) the Defendant intended the improvements to be permanent structures on the land; and

(d) this intent was manifested to the decedent, Plaintiff Clendening and other third parties by the physical facts and outward appearances of the Fuel Farm and water supply facilities, to include wells and water treatment plants, all of which appear to be permanent structures.

21.     The Defendant was in actual possession and control of both the Fuel Farm, the incinerator, the landfill and water supply facilities on base, including the wells, underground piping and delivery systems, water treatment plants, and the hazardous radioactive material and chemical weapons waste at the time the decedent was exposed to and ingested the water and hazardous material that caused his untimely and tragic illnesses and death.

22.     The "Hadnot Point Fuel Farm", the incinerator, the landfill, and the water supply systems were built as a permanent improvement to the Camp Lejeune property, and under North Carolina law is considered an "Improvement to Real Property." When the improvements began leaking hazardous and toxic materials into the ground and underground aquifers, and when hazardous radioactive and chemical waste was introduced to the incinerator and landfill they all would be classified as a "Defective Improvement to Real Property."

## STATUTE OF REPOSE

23.     The claims asserted herein are timely under North Carolina law. As stated above, the Hadnot Point Fuel Farm, the incinerator, the landfill, and the water supply facilities at Camp Lejeune are defective "improvements to real property" within the meaning of N.C. Gen. Stat. § 1-50(a)(5)(a). Because the defective improvements to real property are within the meaning of N.C.

6

Gen. Stat. § 1-50(a)(5)(a), the ten year statute of repose contained in N.C. Gen. Stat. § 1-52(16) is preempted and does not apply to this case.

24.    Since the decedent's death was caused by a defective or unsafe condition to improvements to real property within the meaning of N.C. Gen. Stat. § 1-50(a)(5), § 1- 50(a)(5)a provides that these claims must be brought within six years of the last act or omission giving rise to the cause of action and substantial completion of the improvement.  There are also two exceptions to this repose period in N.C. Gen. Stat. § 1-50(a)(5)d & N.C. Gen. Stat. § 1-50(a)(5)e that will bar the Defendant from asserting this defense.

25.    The Defendant is barred from asserting the repose period in§ 1-50(a)(5) if the Defendant is in actual possession or control of the property and is charged with knowledge of the defective or unsafe condition at the time the condition causes injury.  N.C. Gen. Stat. § 1-50(a)(5)d specifically states "[t]he limitation prescribed by this subdivision shall not be asserted as a defense by any person in actual possession or control, as owner, tenant or otherwise, of the improvement at the time the defective or unsafe condition constitutes the proximate cause of the injury or death for which it is proposed to bring an action, in the event such person in actual possession either knew, or ought reasonably to have known, of the defective or unsafe condition."

26.    Secondly, under section N.C. Gen. Stat. § 1-50(a)(5)e, a Defendant falling within any of the following classes likewise cannot raise the statute of repose defense: "The limitation prescribed by this subsection shall not be asserted as a defense by any person who shall have been guilty of fraud, or willful or wanton negligence in furnishing materials, in developing real property, in performing or furnishing the design, plans, specifications, surveying, supervision, testing, or observation of construction, or construction of an

7

improvement to real property, or a repair to an improvement to real property, or to a surety or a guarantor of any of the foregoing persons, or to any person who shall wrongfully conceal any such fraud, or willful or wanton negligence."

27. The Defendant was in actual possession and control of both the Fuel Farm and water supply facilities at the time the decedent ingested the water that caused his illnesses.

28. In addition, the Defendant knew, or should have known, as of 1979 or 1980 after the discovery of wrongfully disposed radioactive material and continuing thereafter, that the water supplied to the decedent and that the grounds surrounding was hazardous to human health and carcinogenic because the Defendant knew massive leaks of fuel from the Fuel Farm and other pollutants had contaminated the water supply, knew that it had wrongfully disposed of chemical weapons waste and radioactive material, was obligated to make sanitary surveys and testing of the water quality by the BUMED, and owed a continuing duty under North Carolina law to inspect and maintain the premises and discover the defective condition of the Fuel Farm, water supply facilities, the incinerator, the landfill, and drinking water. Because the decedent was injured by the defective condition of the improvements to real property that contaminated the drinking water or were generally exposed to all residents, a private person pursuant to N.C. Gen. Stat.§ 1-50(a)(5)d could not raise the statute of repose contained in N.C. Gen. Stat. § 1-50(a)(5)a.

29. In the alternative, the Defendant's employees engaged in willful or wanton negligence in operating the defective improvements to real property resulting in contaminated drinking water supplied to the decedent and his direct exposure to nuclear and hazardous waste. Even after the Defendant knew that fuel, toxic and hazardous chemicals, and radioactive waste had been buried and had leaked into the ground and the underground

8

aquifer, the Defendant wrongfully concealed from the decedent that the water supplied to him was hazardous to his health or that he was living and working on top of or near radioactive waste. A private person pursuant to N.C. Gen. Stat. § 1-50(a)(5)(e) would be barred from raising the statute of repose contained in N.C. Gen. Stat. § 1-50(a)(5)(a) under these circumstances.

30. The Defendant engaged in willful and wanton conduct in knowingly exposing hundreds of thousands of Marines, their families, and civilians alike to radioactive waste in both direct exposure and indirect exposure.

31. Because a private person under like circumstances would be barred from raising the statute of repose, the Defendant is likewise barred. The Defendant has waived sovereign immunity for the claims asserted therein pursuant to 28 U.S.C. § 2674(a) insofar as a private person would be liable for the negligence alleged under like circumstances.

32. The hazardous conditions created by the Defendant's defective improvement to real property, particularly with regard to the radioactive material and chemical weapons waste pose real and significant risks to hundreds of thousands of Marines, their families, and civilians alike to this day and have not been addressed, remediated, treated or resolved as of the time of the filing of this Complaint.

## VIOLATIONS OF BUMED 6240.3

33. Rather than pipe in water from local municipalities, the Defendant elected to construct its own water supply facilities at Camp Lejeune, to include wells and water treatment plants located throughout the base. The Defendant dug numerous wells to supply drinking water, built water treatment facilities, and constructed numerous pipes to carry water from the wells to the water treatment plant and thereafter to residents, businesses, and military operations

9

throughout the base, including those located at Hadnot Point.

34. In building and maintaining these water supply facilities, the Defendant's employees were required to follow a specific course of action mandated by the Department of Navy Bureau of Medicine and Surgery to ensure that the drinking water provided was safe for human consumption. These orders, known as "BUMEDS," including HOMED 6240.3C, became effective on August 25, 1972.

35. BUMED 6240.3C 6 imposed a specific course of action on the Defendant if a water source was not protected from "pollution" by natural means - the Defendant was required to protect the water supply by treatment. The Defendant *also* was required to make frequent sanitary surveys to identify health hazards in the system:

> a. The water supply should be obtained from the most desirable source which is feasible, and effort should be made to prevent or control pollution of the source. If the source is not adequately protected by natural means, the supply shall be adequately protected by treatment.
>
> b. Frequent sanitary surveys shall be made of the water supply system to locate and identify health hazards which might exist in the system.

BUMED 6240.3C 6(a) & (b).

36. BUMED 6240.3C 7 imposed mandatory water quality standards on the Defendant. These standards included a flat prohibition on allowing drinking water to contain substances hazardous to the health of consumers:

> d. <u>Chemical Characteristics (Limits).</u> Drinking water shall not contain impurities in concentrations which may be hazardous to the health of the consumers ........................Substances which may have deleterious physiological effects, or for which physiological effects are not known, shall not be introduced into the system in a manner which would permit them to reach the consumer.

BUMED 6240.3C 7(d).

37. As part of the construction of Camp Lejeune, the Defendant constructed the Hadnot Point Fuel Farm, a massive complex comprised of above ground and underground fuel storage

10

tanks, valves, flanges, transmission pipes, dikes, and retaining walls. The fuel tanks were filled with gasoline and diesel. The Defendant operated the Fuel Farm from the time of its construction to the present. Additionally, Camp Lejeune constructed all water supply facilities on base which collected water from deep water wells and treated, tested, and approved for human consumption the final water product that was supposed to comply with the standards set forth above.

38.    Although the Fuel Farm was located above the aquifer that supplied the Hadnot Point drinking wells, and was located near some of the drinking wells, the Defendant negligently, carelessly and recklessly permitted toxic and hazardous substances including, but not limited to gasoline and diesel, radioactive material, and chemical weapons waste to leak from the Fuel Farm, the landfill, and the incinerator into the ground.  In violation of BUMED 6240.3C 7(d), the Defendant negligently, carelessly and recklessly allowed or caused (failed to prevent) the fuel and other hazardous material to seep into the aquifer and to drain into the drinking wells.  The toxic and hazardous chemicals in the fuel and the radioactive waste made the water unreasonably dangerous for human consumption.

39.    The contaminated ground water in turn leached toxic and hazardous chemicals into the walls of the water supply wells serving the Hadnot Point water distribution system. The drinking water flowed from the wells into the Hadnot Point water treatment plant.  The Defendant's employees in violation of BUMED 6240.3C 6(a) negligently failed to treat the contaminated water to remove the impurities and instead allowed it to flow directly to residences and businesses of persons living and working in the area.

40.    The Defendant's employees in violation of  BUMED  6240.3C 6(b) negligently also failed to conduct sanitary surveys and tests to determine if the drinking water supplied by the Hadnot Point water supply facilities (to include its wells and water treatment plant) to

11

consumers contained substances that would be hazardous to human health.

## DISCOVERY OF CLAIMS BY PLAINTIFF

41.     From May 1970 to December 1971, the decedent regularly consumed and was exposed to substantial amounts of water supplied by the Hadnot Point water supply facilities. During that time, the water supplied to him by the Defendant for drinking, cooking, bathing, and washing clothing was contaminated and polluted as described herein. The decedent regularly drank tap water and also ingested the contaminated Hadnot Point water in coffee, tea, and food that he consumed on a daily basis.

42.     In 2007, the decedent had been diagnosed with multiple serious life threatening illnesses which later were discovered related to the ingesting and exposure of the toxic and hazardous chemicals in the water including Waldenstrom macroglobulinemia, chronic lymphoblastic lymphoma, and adult leukemia.  On information and belief, the decedent's cancer and other illnesses were proximately caused by or made him more susceptible by his ingestion and exposure of water contaminated by the Hadnot Point Fuel Farm and the water supply facilities at Hadnot Point and the direct exposure to hazardous chemical weapons waste and radioactive material.

43.     That same year, retired Marine master sergeant, Jerry Ensminger, found a 1981 document that described a radioactive dump site at Camp Lejeune that did not comply with federal law.  The waste included strontium 90, a known cause of cancer, and leukemia in particular.  In 1985, master sergeant Ensminger's nine-year old daughter, Janey, died of leukemia.  It was not until 2014 that the Camp acknowledged it had knowledge of the 1981 document, yet, the Defendant still refused to act in the form of remediation, notification, treatment, or any other actions necessary to address its own known illegal radioactive dump

12

site.

44. Now that the radioactive waste at Camp Lejeune was made public, the Defendant finally directed the Environmental Protection Agency ("EPA") to investigate where to potentially test for the direct exposure to radioactive material. There is has been no reported testing from the EPA on this specific issue as of the date of the filing of this Complaint.

45. In 2009, the Defendant, through the Navy directed the National Research Council ("NRC") to conduct a study on the effect of exposure to TCE, PCE, and other VOCs but surprisingly not at all related to any radioactive or chemical waste exposure.

46. In 2011 the Defendant finally directed the Agency for Toxic Substances & Disease Registry ("ATDSR") to attempt to survey former Camp Lejeune employees' health conditions. It was not until 2014 that the Center for Disease Control reported that Marines stationed at Camp Lejeune have a sixty-eight (68%) higher risk of multiple myeloma as suffered by the decedent.

47. In 2016, the Department of Veteran Affairs adopted regulations that the eight associated diseases including the decedent's adult leukemia were presumed to have been caused by his exposure at Camp Lejeune. On November 16, 2016, the decedent died from his cancer caused at Camp Lejeune.

48. In January 2019, the Defendant through the Navy Secretary, Richard Spencer, declared it will deny all civil tort claims related to toxic exposure at Camp Lejeune all while knowingly failing to take any remedial or treatment action whatsoever to address the illegal radioactive and chemical dumping at Camp Lejeune. The Defendant still has not directed any health study regarding direct exposure to radioactive material at Camp Lejeune and continues to hide all of the environmental issues present that are continuing to threaten lives.

13

49.     As stated above, Plaintiff Clendening timely filed a claim pursuant to the requirements of the Federal Tort Claims Act alleging the decedent's illnesses are related to the ingestion and exposure of the toxic, radioactive, and hazardous chemicals, and more than six months has elapsed since filing of said claim.

## STATEMENT OF FACTS

50.     Historically, Camp Lejeune's drinking water was extracted from over 100 wells, treated at eight treatment plants, and distributed to its residents through a network of distribution pipes. The family housing areas were served by three main water distribution systems that served the base-Tarawa Terrace (beginning in 1952), Holcomb Boulevard (starting June 1972), and Hadnot Point (beginning in 1942). The Hadnot Point water distribution system provided water to both Hadnot Point and Holcomb Boulevard service areas and served Hospital Point, Berkeley Manor, Midway Park, Paradise Point, and Watkins Village. It is believed the decedent resided at one of the above Hadnot Point housing areas from 1970-1971.

51.     Hadnot Point Fuel Farm, an improvement to real property which was constructed in 1941, was comprised of 15 fuel tanks.   There was one 600,000 gallon above ground tank, six underground 12,000 gallon tanks, and eight underground 15,000 gallon tanks. The underground tanks were placed at grade and completely covered with soil. The above-ground tank stored diesel fuel while the other tanks stored gasoline, unleaded gasoline, and kerosene. The tanks were located in a highly developed area of the base where natural drainage had been modified by extensive improvements to real property, to include areas of asphalt, concrete, ditches, and storm sewers. The Hadnot Point water supply well (HP-602) was located approximately 1,200 feet northwest and down gradient of the Hadnot Point Fuel Farm.

14

52.     In 1980, the Defendant disclosed that it had found that: (1) the fuel facilities were 35 years old and there was a general deterioration of the tanks and pipelines; (2) maintenance had been minimal due to insufficient funding; (3) Camp Lejeune was deficient in new fueling designs; (4) fuel storage tanks had not been cleaned since they were built; (5) there were many buried valves and flanges that could not be inspected or maintained; (6) automatic lever indicator was installed but never made functional; (7) the exterior coating was beginning to peel on the above ground tank S-1009 (the 60,000 gallon tank) and there was evidence of rust, the protective dike was insufficient and not impervious, and no locks were noted on the drain valve for the tank; (8) Tank S-1031 was discovered to have a leaking valve and pitting in the interior bottom of the tank; and (9) as a result of the leaking valve in tank S-1031, it was determined that another tank valve also leaked badly. Recommendations were made to do the following: test tank S-1009 as soon as possible to prevent leakage, loss of product, and environmental contamination; replace and install new piping, new tank valves and concrete valves for all storage tanks (it was essential that all valves be accessible for proper maintenance); and empty and clean the interiors of all underground storage tanks and inspect them for leaks. It appears that none of the above recommendations were acted upon until 1989.

53.     In March of 1981, funds were allocated to clean and repair the petroleum/oil/lubricant tanks at Hadnot Point Fuel Farm, perform vacuum tests, sandblasting and required repairs. The proposed project also included the installation of high level alarms, reworked dikes and for the piping and valves to be replaced.  The military construction data cites that deterioration leakage problems and potential violation of environmental and safety concerns will continue if the work is not completed. No apparent action was taken by the Defendant with regard to the above warnings for Hadnot Point, nor was this information

15

released to potential victims, including military personnel and/or dependents, or the general public.

54.    In 1984, tests performed by a Navy contractor revealed benzene at 380 parts per million in a Hadnot Point drinking well (HP-602). Discovery of contaminated water supplies at Hadnot Point and its service areas initiated a series of assessments, including the closure of HP-602 in December 1984. The closure of HP-602 prompted a review of other wells on base, several of which were shut down.

55.    By February 1985, operations at all recognized contaminated supply wells within the Hadnot Point Water Treatment Plant distribution network were supposedly terminated because volatile organic compounds (VOCs) were discovered during the latter *part* of 1984 and early 1985.

56.    A 1988 monitoring report described a 15-foot layer of fuel floating on top of the water table a few feet below the service of a fuel farm at the Hadnot Point Industrial Area. The same report found evidence of benzene in monitoring wells at levels as much as 29,000 parts per billion.[2] At a workshop in 1988, a Base Environmental Engineer advised the Defendant that the USTs at Hadnot Point were in such a deteriorated state that they continue to leak at a rate of approximately 1,500 gallons per month. This information was concealed from potential victims, including military personnel and/or dependents, or the general public at that time.

57.    As a result of contamination findings, Camp Lejeune was placed on the U.S. Environmental Protection Agency (EPA) National Priorities List (NPL) on November 4, 1989. By 1991, all groundwater contaminant investigations and remediation activities at Camp Lejeune were placed under the oversight of the Defendant's Comprehensive Environmental

---

[2] The federal standard for drinking water from the Environmental Protection Agency is 5 parts per billion. The standard for the state of North Carolina is 1 part per billion.

16

Response, Compensation, and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA).

58.    While the Defendant appeared to be addressing the fuel and VOC contamination of the drinking water, Defendant's CERCLA plan has not ever nor now acknowledged or agreed to take remedial action to address the chemical weapons wastes and radioactive material waste that were improperly and wrongfully disposed of at the former landfill and the incinerator site.

59.    A 1993 review of environmental treatment options found that storage tanks containing fuel, cleaning solvents and other chemicals had been buried at sites across Camp Lejeune for years.  This information was concealed from potential victims, including military personnel and/or dependents, or the general public at that time.

60.    Once placed on the NPL, the Defendant's Agency for Toxic Substances and Disease Registry (ATSDR), a statutorily created agency, an operating division within the Department of Health and Human Services, at the direction and/or request of Defendant's Department of Defense, is responsible for completing a Public Health Assessment (PHA). In 1997, the ATSDR completed and published a PHA for Camp Lejeune.  However, on May 7, 2009, the ATSDR publicly announced on its website the removal of the 1997 PHA due to additional information emerging related to exposures of VOCs in the drinking water at Camp Lejeune. In addition, as stated above, benzene was present in some water supply wells that were shut down prior to 1985 and this information was not included in the 1997 PHA.  The 1997 PHA was removed because it should have at least mentioned the contamination, but, instead, stated that the extent of exposure to benzene was unknown.

## FIRST CAUSE OF ACTION:
## FRAUD/CONCEALMENT

17

61. Even after the above earlier warnings to Defendant by contracted sources, the true source of the contamination was concealed from affected consumers including the decedent and Plaintiff Clendening by the Defendant until late 2012. Prior to 2012, the Defendant publicly blamed a privately-owned dry cleaners, ABS One Hour Cleaners, for the release of contaminants at Camp Lejeune. It was not until December 2012 that the ATSDR revealed the conclusions of RCRA investigations of leaking above-ground storage tanks (ASTs) and underground storage tanks (USTs), which occurred at approximately 70 locations throughout the Hadnot Point study area. To this day, the Defendant has not acknowledged nor taken any remedial action at all to address the hazardous levels of chemical weapons waste or radioactive material that were wrongfully disposed of at Camp Lejeune.

62. On information and belief, in 2009, a "secret database" was discovered by an independent contractor hired by the ATSDR to do research regarding the underground storage tanks. In researching the leaking tanks, the contractor was given temporary access to documents that were classified as "privileged" by the Department of the Navy and therefore not released to the public. After discovering these documents, the ATSDR fought to have access to any and all documents regarding the contamination at Camp Lejeune to ensure that the scientific data compiled was accurate. Finally, in 2012, the ATSDR was granted access to the database to continue its water modeling reports, but most of these documents are still being withheld from the public.

63. In December 2012, the ATSDR released its "Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plant and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina - Chapter D: Occurrence of Selected Contaminates in Groundwater at Above-Ground and

18

Underground Storage Tank Sites," which discusses the occurrence of specific contaminants in groundwater at above-ground and underground storage tanks at Camp Lejeune during the estimated period of water contamination from approximately 1957 to 1987. During that time, petroleum, oils, and lubricants (POLs) - including gasoline, waste oil, diesel, heating oil, and jet fuel were stored in unmonitored, single-walled underground storage tanks. Over time, these underground storage tanks rusted and leaked, thereby contaminating surrounding groundwater.

64. The 2012 ATSDR Report reveals that water within the Hadnot Point Water Treatment Plant service area was contaminated mostly with trichloroethylene (TCE), as well as PCE and refined petroleum products, such as benzene, toluene, ethylbenzene, and xylenes (BTEX), and that significant contamination occurred in the area of former Hadnot Point Fuel Farm and Building 1115. The refueling facility, Building 1115, had seven underground tanks, installed as early as 1943 (and dug up 50 years later), that were about 300 feet from Hadnot Point Well 602. Maximum benzene concentrations in samples taken from monitor wells at the Hadnot Point Fuel Farm and Building 1115 reached 43,000 micrograms per liter which points to fuel contamination near the building as a likely source of contamination. The information and data released in the 2012 ATSDR Report emphasizes the groundwater contamination by BTEX components at sites of leaking ASTs and USTs at Hadnot Point Fuel Farm.

65. The 2012 ATSDR Report summarizes the newly discovered results of investigations at 64 designated RCRA study areas and emphasizes the occurrence and distribution of BTEX components, such as benzene, within groundwater of the areas served by the Hadnot Point and Holcomb Boulevard Water Treatment Plants.

66. In 2014, the Defendant admitted that it was aware of illegal radioactive dumping at Camp Lejeune, yet continued to attribute all of the health conditions at Camp Lejeune into

19

their statute of repose defensible position that it was all caused by water contamination from wells that were closed in 1985. The Defendant continues to ignore the significantly more hazardous direct exposure of material in the form of radioactive waste and chemical weapons waste present at Camp Lejeune.

67. As stated above, nearly three decades after the contaminated wells were closed, monitoring wells are still finding poisons at thousands of times the drinking water safety standards. Further, the Defendant still refuses to acknowledge, address, remediate, or treat for the wrongful disposal of chemical weapons waste and radioactive material.

## SECOND CAUSE OF ACTION:
## WILLFUL AND WANTON NEGLIGENCE

68. The Defendant did not release any of its findings that the Hadnot Point Fuel Farm was the source of the contamination until December 2012. Prior to this time, very limited, if not false, information regarding the source of contamination was provided to the public, to include military members, dependents, and other potential victims. As revealed in the 2012 ATSDR Report, groundwater within the Hadnot Point Water Treatment Plant service area was contaminated with trichloroethylene (TCE), as well as PCE and refined petroleum products, such as benzene, toluene, ethylbenzene, and xylenes (BTEX) due to the leakage of underground and above-ground storage tanks at Hadnot Point Fuel Farm.

69. At all times relevant, Defendant was required to maintain Hadnot Point Fuel Farm and its water supply facilities at Camp Lejeune in a manner that was compliant, not only with due care, but also with any and all federal, state, and/or all applicable military regulations, orders, procedures, instructions or standards to ensure there were no defects, leaks, or contamination that would interfere with the health, safety and welfare of all

20

individuals that would reasonably and foreseeably consume or become physically exposed to the Hadnot Point water supply system, chemical weapons waste, or radioactive material. For years, the Defendant fraudulently concealed and misled the source of the contamination at Camp Lejeune. It was not until 2012 that the Defendant released any information regarding the defective improvement to real property at Hadnot Fuel Farm. The extent of the chemical weapons waste and radioactive material contamination is still unknown because the Defendant refuses to acknowledge or properly address its wrongful conduct.

70.    At all pertinent times, Defendant, through its agents, servants and employees, acting within the course and scope of their employment, was fraudulent and willfully and wantonly negligent in failing to follow their mandate and failed to exercise due care by causing or allowing various pollutants and contaminants, such as trichloroethylene (TCE), as well as PCE and refined petroleum products, such as benzene, toluene, ethylbenzene, xylenes (BTEX), strontium-90, Cesium-137 and other contaminates to leak as result of a defective improvement to real property, contaminate the base water supply in quantities that Defendant knew or should have known were dangerous to the human life, health and welfare of those to whom they were supplying the water, including the decedent.

71.    Subsequent to Defendant's knowing or having reason to know that said improvement to real property was defective, and thereby causing the release of potentially dangerous and/or hazardous chemicals, that Defendant had the duty to warn the consumer to whom it was supplying said water, even if the harmful effects were uncertain or unknown.

72.    As stated above, the base command already knew well before the decedent resided on

21

base that they had wrongfully disposed of chemical weapons waste and radioactive material and that the possibility of contaminants leaking from or into the water system and from the defective improvements to real property and the potential health hazard to the persons expected to use the water supply, but was fraudulent and willful in concealing the contamination and the threat to human health, and wantonly or negligently failed to take the necessary steps to warn, examine, survey, protect and/or to provide a safe water system or to prevent exposure to the personnel and civilians at Camp Lejeune, including the decedent.

73. At all times relevant, agents, servants, and/or employees of Defendant, acting within the course and scope of their employment, fraudulently caused or permitted large quantities of contaminants to be leaked from a defective improvement to real property, without providing notice or warnings to consumers that they were being exposed to the dangerous and/or potentially poisonous substances and the source of said contaminants, that Defendant knew or should have known were leaching into the aforementioned water supply system or would be directly exposed to the inhabitants and visitors of Camp Lejeune, including the decedent.

74. At all relevant times, Defendant knew or should have known that the leakage from defective improvements to real property, and the wrongful disposal of chemical weapons waste and radioactive material were causing the water to be contaminated and would likely cause a variety of health problems, including but not limited to cancers, liver and kidney damage, autoimmune deficiencies, central nervous system disturbances in humans, disfigurement, pain, suffering and possibly death to the people to whom Defendant provided said water system or that the Defendant exposed to its grounds at Camp Lejeune.

75. At all relevant times, the Defendant through the acts and omissions of its agents,

22

servants and/or employees acting within the course and scope of its employment were fraudulent and willfully and wantonly negligent, and in violation of its standard of due care in at least the following ways:

a.  In failing to inspect and maintain the premises, including its improvements to real property (i.e., Hadnot Point Fuel Farm and its water supply facilities);

b.  In failing to check the underground fuel tanks to ensure there were no leaks;

c.  In failing to make sure that no potential health hazard existed in said water supply from a defective improvement to real property, either from the location, design or construction of the system that could allow pollution to contaminate the ground water, even if the physiological effects were not known;

d.  In failing to provide well-trained and competent personnel whose qualifications are commensurate with the responsibility of conscientiously operating, constructing, and/or repairing said improvements to real property so that the water was not contaminated;

e.  In failing to conduct frequent surveys of the water, and whenever surveys or tests were made, failing to take steps to repair any and all defective improvements to real property;

f.  In failing to monitor and warn the inhabitants and other exposed persons at Camp Lejeune of the exposure to the exceedingly high levels of contaminants caused by defective improvements to real property and the potential damage of exposure to the water supply;

g.  In fraudulently continuing to not only warn and notify, but to instill a level of confidence in those persons exposed to these contaminants and pollution that

23

there is no proven connection between their identifiable illnesses, disfigurements and deaths and the poisons that existed in the water supply;

h. Even after Defendant was specifically warned by its own agents and contractors that it was supplying contaminated or polluted water to the inhabitants of Camp Lejeune, it was fraudulent and willfully and wantonly negligent in failing to timely repair defective improvements to real property for years thereafter without notice or warning to the people exposed;

i. In failing to construct or inspect improvements to real property to ensure the proper materials are used;

j. In failing to properly develop real property;

k. In failing to properly perform or furnish the design, plans, specifications, surveying, supervision, testing or observation of construction, or construction of improvements to real property;

l. In failing to properly construct improvements to real property;

m. In failing to properly repair improvements to real property;

n. In wrongfully concealing such fraud, willful or wanton negligence with regard to real property;

o. In that in addition to violating the standard of due care, Defendant is negligent in violating applicable federal, state, and/or military regulations, orders, procedures or standards intended for the safety, health and welfare of the people located at Camp Lejeune; and

p. In continuing to the present day to instill a doubt in the minds of its victims by maintaining, insinuating or implying that there was no problem existing or if there was, that there is no causal link between the exposure to these

24

contaminants and pollutants and their health problems.

q. In continuing to the present day to fail to take any action to fully acknowledge, address, remediate, or treat for its wrongful disposal of radioactive material and chemical weapons waste at Camp Lejeune.

## THIRD CAUSE OF ACTION:
## FRAUDULENT PUBLICATION NOTICE TO THE PUBLIC

75. In or about November 1979, Defendant, through its Environmental Protection Agency published a Suggested No Adverse Reaction level for trichloroethylene (TCE) of no more than 75 parts per billion in a water supply.

76. In or about April 1980, Defendant, through its Environmental Protection Agency, published a Suggested No Adverse Reaction Level for perchloroethylene (another name for Tetrachloroethylene) for long term exposure not to exceed 20 parts per billion in a water supply system

77. Defendant's Environmental Protection Agency's Suggested No Adverse Reaction Levels for perchloroethylene and trichloroethylene, regardless of whether they were "legally" binding, along with other publications, and mandates, procedures or standards, such as the said BUMEDs actively or constructively, put the base command on further notice that the exceedingly high levels of contaminants and pollution in the water supply system would likely and foreseeably cause harm to the people to whom they were supplying the subject water.

78. In fact, when the tap water was tested in or about May of 1982, the trichloroethylene level in the Hadnot Point area of Camp Lejeune was as high as 140 parts per billion.

79. At no time did Defendant warn the individuals at the base or those coming onto the base that would be reasonably expected to be exposed to the water, that said water supply had been

25

contaminated by toxic pollutants which had leaked into the groundwater from a defective improvement to real property (i.e., Hadnot Point Fuel Farm and/or water supply facilities) and could and/or would potentially harm them and their families.

80. The Defendant's April 9, 1981 M67001.AR.007167 seven-page case study to evaluate the toxicity of the radioactive exposure to the inhabitants and guests of Camp Lejeune, was a fraudulent concealment and a wrongful attempt to whitewash the known improper disposal of radioactive material at Camp Lejeune. In the report, the Defendant improperly attributed the radioactive readings to naturally occurring phenomena otherwise not known or discovered at the base. The Defendant, even through CERCLA, has not to this day, acknowledged, addressed, remediated or treated for the wrongful disposal of radioactive material at or near the decedent's housing barracks.

81. That Defendant fraudulently failed or refused to notify the people exposed to the contaminated water or material of their potentially dangerous exposures and the nature and extent of the related potential health issues.

82. The Defendant's fraudulent publication of alleged facts to the public mislead the decedent away from treating or addressing his likely radioactive and toxic exposures and ultimately lead to his premature death.

## FOURTH CAUSE OF ACTION:
## WRONGFUL DEATH WATER CONTAMINATION

83. Plaintiff Clendening was married to the decedent, a retired United States Marine, Gary James Clendening. The decedent resided in one of the housing areas served by the Hadnot Point water distribution system and worked and was housed near radioactive material and chemical weapons waste from May 1970 until December 1971. During that time, the water supplied to him for drinking, cooking, and bathing by the Defendant was contaminated

26

and polluted as described above. Further, the grounds where the decedent lived and worked during that time was contaminated as described above.

84.    As a direct and proximate cause of the exposure to said pollutants and contaminants at Camp Lejeune, the decedent developed Waldenstrom macroglobulinemia, chronic lymphoblastic lymphoma, and adult leukemia, and ultimately suffered a wrongful death.

85.    As a direct and proximate cause of the exposure to said pollutants and contaminants at Camp Lejeune, the decedent was wrongfully killed, and his widow, Plaintiff Clendening continues to suffer for the lack of his earnings, love, and companionship.

## FIFTH CAUSE OF ACTION:
## WRONGFUL DEATH DIRECT EXPOSURE

86.    Plaintiff Clendening was married to the decedent, a retired United States Marine, Gary James Clendening.  The decedent resided in one of the housing areas and worked and was housed near radioactive material and chemical weapons waste from May 1970 until December 1971. During that time, the decedent was directly exposed to improperly disposed radioactive and hazardous material. Further, the grounds where the decedent lived and worked during that time was contaminated as described above.

87.    As a direct and proximate cause of the exposure to said pollutants and contaminants at Camp Lejeune, the decedent developed Waldenstrom macroglobulinemia, chronic lymphoblastic lymphoma, and adult leukemia, and ultimately suffered a wrongful death.

88.    Plaintiff Clendening has lost the decedent's earnings capacity, love and companionship as a direct and proximate result of the Defendant's wrongful conduct.  Liability for the horrific damages she continues to endure arises directly and/or indirectly from the exposure to contaminants at Camp Lejeune.

89.    The decedent, Gary James Clendening, was highly praised as a JAG Officer for his hard work, quick thinking, and excellent command of the rules.  He went on to become a repeatedly

27

recognized super lawyer in his home state of Indiana as a defense trial attorney. He was a member of the highly recognized American College of Trial Lawyers. The decedent served his country with honor, but he did not sign up to be unknowingly exposed to toxic and radioactive material only to die prematurely.

90.    Plaintiff Clendening continues to learn of the cause of the decedent's cancer as the Defendant's contamination continues to be exposed.

91.    The Defendant is the only entity known in the United States to possess the equipment necessary to test individuals directly exposed to radioactive material. Plaintiff Clendening still has some cremains of the decedent that can be made available to test whether they contain elevated levels of Strontium-90, Cesium-137, and other radioactive isotopes that more likely than not contributed to the decedent's death.

92.    As a direct and proximate cause of the exposure to said pollutants and contaminants at Camp Lejeune, the decedent was wrongfully killed, and his widow, Plaintiff Clendening continues to suffer for the lack of his earnings, love, and companionship.

WHEREFORE: Plaintiff Clendening demands judgment against Defendant in the amount of fifteen million dollars ($15,000,000.00) that will fully compensate her for all the losses she has suffered and will suffer in the future as allowed by the applicable law and for costs, fees and other further relief that the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff Clendening demands a jury trial for all so triable issues.

Respectfully submitted,

NICK BAKER LAW, LLC


By: _____

Nicholas F. Baker
Attorney for Plaintiffs
320 N. Meridian Street, Suite 801
Indianapolis, IN 45204
Telephone: (317) 456-7889
Facsimile: (317) 939-3545
Email: nick@nickbakerlaw.com

CAROLINA LAW GROUP, P.L.L.C.


By: _____
Thomas A. Kellis II


By: _____
Russ E. Boltz
Local Civil Rule 83.1(d) Counsel for Plaintiff
1723 South Glenburnie Rd.
New Bern, NC 28562
Telephone: 252-636-3737
Facsimile: 252-637-9597
Email: tommy@carolinalawgrp.com
Email: russ@carolinalawgrp.com



Dated: July 24, 2019